UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————X

DANIEL MELLO, VALENTINA GONZALEZ,
ELKIN GARCIA, MATIAS CORDOBA, JEAN
GONZALEZ and ALEJANDRA GOMEZ,

Civil Action No.

Plaintiffs,

vs.

UNITED PRODUCTION WORKERS UNION,
LOCAL 17-18, a Labor Organization, and
DOUGLAS ISAACSON

BRIEF IN SUPPORT OF
ORDER TO SHOW CAUSE AND
PRELIMINARY INJUNCTION

Defendants.

————————————————————X

**BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

**I.  Introduction[1]**

Labor-Management Reporting and Disclosure Act of 1959 (LMRDA)

**I.  Introduction**

This is a case in which a union has refused to hold elections for at least *18 years*, and now

that Plaintiffs (with the assistance of the Department of Labor) have forced an election, the union

seeks to expel the Plaintiffs challenging the current leadership in the upcoming election, in the

hopes of eliminating any challenge to the current leadership.  Plaintiffs respectfully seek the

---

[1]  The statements of facts in this brief are supported by the allegations of the Complaint
and the Verifications of Daniel Mello, Valentina Gonzalez, Elkin Garcia, Matias Cordoba, Jean
Gonzalez And Alejandra Gomez.

1

Court's immediate intervention to preserve the status quo and prohibit Plaintiffs' expulsion from the Union, so that a fair election can proceed.

Congress enacted the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) to guarantee "'free and democratic' union elections modeled on 'political elections in this country.'" *Local 3489, United Steelworkers of America v. Usery,* 429 U.S. 305, 309 (1977). "Title I of the LMRDA was specifically designed to protect the union member's right to seek higher office in the union," *Hall v. Cole,* 412 U.S. 1, 14 (1973), and includes provisions guaranteeing union members equal voting rights, due process, and—most importantly here— free speech in union affairs similar to that provided by First Amendment. 29 U.S.C. §§ 411(a)(1), (2), (5). The First Amendment's right to free speech has its greatest force, obviously, in the context of elections. Moreover, to prevent unions from eliminating challenges to their leadership through internal union disciplinary proceedings, the LMRDA provides a safeguard against improper disciplinary action. 29 U.S.C. § 411(a)(5).

The union at issue here is The United Production Workers Union, Local 17-18 ("Local 17-18" or "Union"). Local 17-18 represents approximately 3000 employees engaged in factory and warehouse work in the New York metropolitan area. For at least the past *30 years*, the President of the Union has been Defendant Douglas Isaacson ("Isaacson"). Prior to Isaacson's installation as President, the Union President was David Ganz ("Ganz") who ran Local 17-18 until his 1987 conviction for mail fraud and embezzlement connected with his union activities.[2]

---

[2] *See, e.g.,* Jeffrey Goldberg, *When Jews Sweat Labor, Ex-Con Stands Between Workers, ILGWU,* The Jewish Forward: News that Matters to American Jews, (Mar. 18, 1994) (describing Ganz's history with Local 17-18 and his 1987 conviction connected to union activities at Local 17-18) available at <<https://failedmessiah.typepad.com/failed_messiahcom/2008/09/the-agriprocess.html>>.

After serving his prison sentence, Ganz became the head of the employer group with which the Union negotiates, the Tri-State Commercial Association, "an umbrella group of Chasidic factory owner who have banded together."  (See Jeffrey Goldberg, *When Jews Sweat Labor, Ex-Con Stands Between Workers, ILGWU,* The Jewish Forward: News that Matters to American Jews, (Mar. 18, 1994))  Needless to say, the Union leadership's close relationship with the employers' association has led many of the Union's largely Hispanic membership to question the leadership's commitment to their interests.

The Union's members, however, have had no opportunity to make their preferences known because the Union has *refused to hold an election for at least 18 years.*  The union is governed by a seven-member executive board whose officers, pursuant to the LMRDA, 29 U.S.C. § 401(b), must be chosen by election no less than once every three years. Defendants have assiduously ignored that requirement for decades.

Finally, in May 2019, Plaintiffs Mello, Garcia and Cordoba complained to Isaacson about never having the opportunity to vote in an officer election.  Each has been a member of the Union for more than 18 years and has never witnesses an election.  The response of the Union leadership was revealing: repeated attempts to bribe Plaintiffs, offering them cash or "no show" staff positions to drop their demand for an election.  Plaintiffs rejected these bribes for the good of the other members.  Finally, after the intervention of the Office of Labor Management Statistics ("OLMS") of United States Department of Labor ("DOL"), the Union signed a voluntary compliance agreement requiring an election.

Ultimately, four of the Plaintiffs here, Mello, V. Gonzalez, Garcia and Cordoba (collectively "Plaintiff Candidates"), began their campaign to run for union offices. But Defendants were not content to permit a free and fair election. Instead, shortly after signing the voluntary compliance agreement, the Union began trumped-up internal discipline proceedings seeking to expel Plaintiffs Mello, V. Gonzalez, Garcia and Cordoba from the Union altogether. This was the first disciplinary proceedings in the Union's 30-year history. The Union blatantly ignored its own by-laws and constitution in ramming the expulsion through, not even providing the Plaintiffs the basic due process protections guaranteed by the LMRDA's "Bill of Rights." That expulsion process is set to conclude today, not coincidentally the day before nominations for the upcoming elections. As the Union knows well, OLMS does not have jurisdiction to intervene in unlawful internal union discipline proceedings. Defendants thus hoped that this expulsion process would effectively thwart any meaningful election.

The Union leadership based the expulsion on a handful of private text messages and Facebook posts `in which the Plaintiff Candidates had described the current leadership as "Jews" who sought to benefit the Jewish owners of their employers, rather than the Hispanic membership of the Union. However unfortunate these comments, they cannot be the basis for an expulsion in the middle of a union election. The LMRDA's Bill of Rights is intended to provide First-Amendment like guarantees in union elections. No candidate for public office in the United States could be disqualified based on such comments. The First Amendment protects even the rights of avowed neo-Nazis and white supremacists to run for office.

Finally, the most basic requirement of a meaningful election is the appearance of all eligible candidates on the ballot and the ability of the winning candidate to assume office. The Union's action will deprive Geim Gonzalez ("G. Gonzalez") and Alejandra Gomez ("Gomez") (Collectively "Plaintiff Members") of their right to vote for a candidate of their choosing.

The Court should issue a temporary restraining order and Order to Show Cause, prohibiting any expulsion, or reinstating Plaintiffs if they have already been expelled.

**Facts**

On May 19, 2019 Plaintiffs Mello, Garcia, and Cordoba met with Isaacson and his attorney Joel Spivak to request that the Union hold an election for Union officers to select a President, a Vice-President, a Recording Secretary, a Treasurer and three members of the Union's executive board. Isaacson responded on May 19, 2019 that he could offer Plaintiff Mello, Garcia and Cordoba staff positions inside the Union in place of the election.

On or about June 5, 2019, President Isaacson sent Recording Secretary Luis Moriano, Business Agent Francisco Jarra and Business Agent Julian Marquez to meet with Plaintiffs Mello, Garcia and Cordoba to offer each $20,000.00 to stop pursuing an election at Local 17-18.

On or about June 11, 2019 Business Agent Marquez met with Plaintiff Mello to offer him a no show union staff job paying $800 per week at Local 17-18 in exchange for his agreement to stop asking for an election at the union.

On or about August 5, 2019, Plaintiffs Mello, Garcia and Cordoba filed a written complaint with OLMS complaining that Defendant has not held union officer election for at least

the last 18 (eighteen years).

On September 16, 2019 Defendant entered into a voluntary compliance agreement to hold new nominations, elections and installations for seven union officers including the offices of President, Vice President, Recording Secretary, Treasurer and three Executive Board positions on or before May 22, 2020.  On or about October 2019 Plaintiff Canidates began campaigning for the upcoming union election to be held in the spring of 2020, with Mello running for President, Gonzalez running for Vice President, Cordoba running for Recording Secretary and Garcia running for Treasurer.

On or about February 10, 2020 Plaintiffs received unsigned internal union discipline charges for "circulating literature in connection with the upcoming union election that attacks the incumbent leadership because, according to the literature, they are Jewish. … [stating] that the leadership of Local 17-18 has taken actions with respect to employers because the leaders and employers were all Jewish."  The unsigned charge concludes that Plaintiff's campaign literatures are anti-Semitic and that Plaintiff Candidates are charged with violating Article XI, Section 2 of the Local 17-18 Constitution and Bylaws and that the union would be disciplining them for abusing other members.

On or about February 18, 2020 Plaintiff Candidates attended a Special Membership meeting convened to choose a five person Trial Committee at the direction of a new Attorney for Defendant, Arthur Schwartz, "Schwartz" stated at the meeting and later in writing that he had been hired by Defendant to act as special counsel to conduct its election of officers **and** to act as counsel in the trial against the Candidate Plaintiffs.  At this meeting, Schwartz announced that

five members, Eligio Garcia, Yanira Ramirez-Herrera, Jonathan Escalona and Maria Sarawillo were the union members that brought the disciplinary complaint against Plaintiff Canidates for abuse of another member.  President Isaacson and Treasurer Chaim Stern refrained from participation in the meeting as they were the abused members.  The appointment of the Trial Committee did not comply with the Constitution and Bylaws in that at least two of the five member Trial Committee members must be elected by the members present at the meeting.  This did not happen.  At the end of the meeting, Schwartz approached Mello and laughingly told him that he could not wait to see him at the trial without a lawyer.

Mello individually and the Plaintiff Candidates also filed two of their own discipline charges at this meeting against President Isaacson and Business Agent Marquez, but no Trial Committee was chosen and to date the union has not processed those charges.  On February 21, 2020, Plaintiffs were notified that a trial would be held 10 days later on March 3, 2020.

On February 27, 2020 Plaintiff Candidates wrote objections to Defendant complaining of the unconstitutional processing of the discipline charges, violations to the bylaws, demanding a copy of signed charges with more specifity as to what circulating campaign literature was found to be abuse of another member and any supporting evidence in connection with the discipline charges so that they could prepare a defense.

On February 29, 2020 Defendant responded by attaching evidence of "Facebook" and "WhatsApp" posts from private chat rooms and provided the signed complaint from the four accusers.  On March 2, 2020, the day before the trial, Plaintiff s filed more objections on the processing of their discipline by the Union complaining that they did not have enough time to

7

prepare a defense based on evidence received 48 hours prior to the trial, that they had just received the signed charges 2 days prior, that a lawyer's involvement in the trial is not supported by the Constitution, that the Trial Committee has not responded to their objections, that the Trial Committee was not convened pursuant to the Constitution and Bylaws, that the time and place of the trial is impracticable and asking for Recording Secretary Moreano to be present as a witness at the trial to explain how he processed the discipline.

At the trial on March 3, 2020 of the five person Trial Committee only three members appeared. Of the four accusers of Plaintiff Candidates only one appeared who did not make any statements relevant to the charges against the Plaintiff Candidates. The evidence that had been provided to Plaintiffs on February 29, 2020 was "entered" by Isaacson and Schwartz. There was no testimony as to when, where, or how the evidence was abusive to another member. At the trial, Plaintiffs were not permitted to face their accusers. At the trial there was no testimony about any specific Facebook or WhatsApp posts. The Plaintiff Candidates asked for more time to prepare their defense again, Schwartz denied this request. The Plaintiff Candidates apologized for making any discriminatory statements, apologized directly to Isaacson and explained that it was not their intention.

On or about March 9, 2020 Defendant provided Plaintiff Candidates a transcript of the trial without full Spanish transcription of the statements made in Spanish at the trial. On or about March 9, 2020 the trial committee presented Plaintiff Candidates a decision to discipline them with the penalty of expulsion signed by only three of the five appointed members of the Committee. On or about March 9, 2020 Defendant notified Plaintiff Candidates that a Special

8

Membership meeting would be held on March 25, 2020 for the membership to be read the Trial Committee decision.  This meeting was postponed and rather than reschedule it, Defendant skipped it in violation of the Constitution and Bylaws.

On or about April 2, 2020, Plaintiff Candidates submitted their appeal of the Trial Committee decision to the seven member Executive Board.  In their appeal Plaintiff Candidates point out that: the Executive Board was only made up of six members, Plaintiff Candidate's were not given copies of exhibits from the trial, Schwartz did not give Plaintiff Candidates an opportunity to review documents at the trial, Moreano failed to appear as a witness, the allegations in the trial committee decision are different from the allegations in the complaint, they could not face their accusers, all the offensive posts are in Spanish but the evidence was in English so who translated the posts, that no witness came forward to say that they had actually read their posts.  In conclusion, Plaintiffs wrote: "This trial did not protect our substantive rights and did not ensure that we had reasonable notice, a fair hearing and a decision based on the evidence."

On or about July 15, 2020 Defendant's Executive Board and Schwartz convened a meeting to hear Plaintiff's appeal.  Plaintiffs were told that their statement to the Executive Board had to be in English for Schwartz benefit and no Spanish language translator was available.

On or about July 22, 2020 Defendant denied Plaintiff's appeal.

On or about August 9, 2020 Plaintiff's appealed Defendant's Executive Board decision.

On or about September 16, 2020, OLMS scheduled a pre election conference for October

1, 2020.

On or about September 28, 2020 Schwartz wrote to the Plaintiffs that the union's executive board had decided to unilaterally change the requirements of the Constitution and Bylaws to make the final Special Membership meeting where members would take the final vote on whether to expel Plaintiff Candidates remotely scheduled for October 12, 2020 via zoom. Plaintiff Candidates objected that the Constitution could not be amended by the Executive Board and explained that the approximately 3000 members were not comfortable using zoom technology and would not be able to fully participate in this manner. Defendant denied Plaintiff Candidate's objection. On October 12, 2020 only one member appeared at this meeting zia zoom.

Rather than allow members to vote at the October 12, 2020 Special Membership meeting as is required in the Constitution and Bylaws, Defendant unilaterally amended its Constitution and Bylaws further to order a mail in ballot vote on whether Plaintiff Candidates should be expelled from the union. Plaintiff Candidates objected to this amendment of the Constitution and Defendant denied it. In order for the membership to hear a defense from the Plaintiff Candidates, Defendant promised to include Plaintiff Candidate's last appeal letter submitted to the Executive Board on April 2, 2020 and a one page statement from the accusers.

On October 2, 2020 Defendant mailed expulsion ballots out to its membership and rather than include the promised one page defense that Plaintiff Candidates had delivered to the Executive Board, Defendant included a one page statement from Isaacson stating that Plaintiffs were accused of "circulating racist, anti-Semetic (anti Jewish) literature in connection with the

10

upcoming union election…" and that the trial committee made a finding that Plaintiffs were "guilty of circulating and posting on Facebook and Whatsapp [sic] anti-semetic remarks…." On October 16, 2020 Plaintiff's realized that the expulsion ballot mailing did not include any mention of any defense made by the Plaintiffs in their numerous appeal letters. Moreover the mailing refers its members to access the union website for information on how to access the October 12, 2020 zoom Membership meeting, it does not include the zoom link and does not even include the union's website address.

Plaintiff Candidates were not permitted to observe the printing or stuffing of the envelopes preceding the expulsion ballot mailing by Defendant. On or about October 16, 2020 Plaintiff Candidates complained to Defendant about the expulsion ballot mailing missing their appeal letter. Defendant initially denied that Plaintiff Candidate's appeal letter was not included in the expulsion ballot mailing. Plaintiff Candidates then presented Defendant with the fact that over 25 members also did not receive Plaintiff Candidate's statement in their defense in the expulsion mailing and demanded an explanation. Rather than agree to redo the expulsion ballot mailing, Defendant denied the request of Plaintiff Candidates without even investigating this anomaly in the expulsion ballot mailing.

The expulsion ballot count occurred on October 20, 2020. The received ballots approve the expulsion of Plaintiff Candidates, as such they will no longer be members of the union. Plaintiff Candidates need their membership restored to maintain their eligibility to run for office under the Union's Constitution and Bylaws.

Title I of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA)

provides a "Bill of Rights" for labor union members, including various protections for members involved in union elections. Section 102 provides that any person whose Title I rights have been violated may bring an action in federal district court "for such relief (including injunctions) as may be appropriate.". This Court has jurisdiction to order remedies during an ongoing officer election, as long as such relief does not "substantially" delay or block the conduct of the election. *Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley,* 467 U.S. 526, 548, 550 (1984). By seeking the emergency relief described in their pleadings, plaintiffs seek to avoid the irreparable injuries that will befall themselves and other members of the Local 17-18 in the absence of pre-election relief. The usual post-election remedy is a suit, filed in the discretion of the Secretary of Labor, to set aside the election and conduct a new election under the Secretary's supervision. See 29 U.S.C. § 482. But, such post-election proceedings routinely take two or three years – *i.e.,* a full term of office. Thus in *Waring v. International Longshoremen's Ass'n, Local 1414,* 1987 WL 149722, 55 U.S.L.W. 2405 (S.D. Ga.1987), the court granted a six-week delay of the election, before it began, where the plaintiff who sought to be a candidate in the election showed that he had been suspended from membership in a union hearing lacking due process, to permit the union sufficient time to remedy the due process violation before holding nominations.

The process that Defendants have engaged in is textbook violations of the right to free speech and due process that is contained in the LMRDA's Bill of Right for union members. The guarantees of free speech are heightened during campaign speech. The purpose behind the free speech guarantees of the Bill of Rights is to encourage and protect with broad latitude speech

that is critical of union administrations.  The Bill of Rights was also created with the singular focus of rooting out corruption by ensuring that union members would not be subject to improper discipline without due process.

The potential irreparable injuries to the membership's voting rights and to their right to be governed by the candidates whom they vote for, support and nominated with the intention to be able to choose bargaining representatives and management of the union are long-term and substantial.  For this reason, Plaintiffs respectfully ask the Court to order the Defendant cease and desist from the Plaintiff Candidates removal from membership.  Plaintiff Candidates will lose their eligibility to remain candidates in their officer election under Defendant's Constitution and Bylaws if they are expelled by the union on the eve of the officer election set for November 14, 2020 to December 14, 2020.

This is the surest way, as well, to avoid the risk, already clearly telegraphed, that the Defendant, now forced by the Federal Government to run an election for the first time in at least 18 years, plans to expel opposition candidates from the union so as to run incumbent candidates unopposed. What Title I adds to the LMRDA's election provisions is a vehicle for fixing election violations **before** they cause irreversible damage, so that members' leadership choices may actually be honored. Title I election remedies are thus crucial to the Act's overarching commitment to union democracy.

## II.  ARGUMENT

### A.  Preliminary Injunction Standard

This Court has long established a framework for guiding the issuance of a preliminary

injunction. The reviewing Court must balance the following four factors when determining whether a preliminary injunction is warranted:

(1) Whether the movant has a reasonable predictability of success on the merits;

(2) whether irreparable harm would result if the relief sought is not granted;

(3) whether the relief would result in greater harm to the non-moving party, and

(4) whether the relief is in the public interest.

*Swartzwelder v. McNeilly*, 297 F.3d. 228, 233 (3d Cir. 2002).

The relief sought here is well within what is authorized by Title I of the LMRDA. Title I grants district courts broad discretion to fashion whatever *appropriate* relief is required to remedy the particular violation. *Hall v. Cole,* 412 U.S. 1, 10-11 (1973). Injunctive relief is in fact the customary remedy for violations of members' rights under 29 U.S.C. § 411. *E.g., American Postal Workers Union, Local 6885 v. APWU,* 665 F.2d 1096, 1110 n.27 (D.C. Cir. 1981) (Mikva, J.) (contract ratification); *Carothers v. McCarthy,* 705 F. Supp. 687 (D.D.C. 1989) (mandatory injunction compelling distribution of contract proposals to permit debate and informed contract ratification vote); *Meek v. International Brotherhood of Teamsters (Airline Division)*, 681 F. Supp. 1014 (E.D.N.Y. 1988), *app. dismissed,* Docket No. 88-7229 (2d Cir. Nov. 10, 1988) (mandatory injunction to compel reinstatement of members' elected negotiating committee representatives).

### B. Plaintiffs Have a Reasonable Predictability of Success on the Merits.

In *Quinn v. Chiofalo,* the Eastern District Court of New York has held that: "The LMRDA was enacted to encourage democratic self-governance in unions and to curb widespread

abuses and corruption among union leadership." 2003 WL 22952859 at 8 (E.D.N.Y. Aug. 26, 2003). *See also Maddalone v. Local 17. United Bhd. of Carpenters Joiners of Am*., 152 F.3d 178, 183 (2d Cir. 1998) (citing *Franza v. Int'l Bhd of Teamsters. Local 671*.869 F.2d 41, 44 (2d Cir. 1989)). This matter is one in which Defendant has spent more than 18 years discouraging and avoiding elections while engaging in widespread abuse by its leadership. Absent the relief sought here, that pattern will continue.

### 1. The Statements for Which Plaintiffs Are Being Expelled Are Likely Protected by LMRDA's <u>Freedom of Speech Guarantee</u>.

In the LMRDA, Congress has provided members of labor unions broad rights of free expression, especially in the context of elections:

> Freedom of speech and assembly. — Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2). As explained by the Second Circuit, "the LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those

who dare to question and complain." *Salzhandler v. Caputo*, 316 F.2d 448-449 (2d Cir. 1963).

The *Salzhandler* court goes on to explain that "Congress has decided that it is in the public interest that unions be democratically governed and toward that end that discussion should be free and untrammeled and that reprisals within the union for the expression of views should be prohibited." *Id.* at 451. The LMRDA's guarantee of freedom of speech and assembly to union members "protects union members from direct interference with union membership rights in retaliation for their expression of opinions concerning union activities." *Cotter v. Owens,* 753 F.2d 223, 228 (2d Cir. 1985).

In this matter, Plaintiff Candidates—as part of the first union election campaign in two decades—complained that the membership of the union is overwhelming of Hispanic background, but the Union President is a Hasidic Jew, as are the owners of the 52 factories and warehouses with whom Local 17-18 bargains with. The President of the Tri-State Commercial Association Ltd., which is the employer association with which Local 17-18 bargains on behalf of its members, is also a Hasidic Jew. During the election campaign, Plaintiff Candidates referred in some private text messages with union members to the current leadership of the Union as "Jews" and complained that the current leadership runs the Union to benefit the interests of the Jewish owners of the employers, rather than its Hispanic members. Even if such statements were badly phrased or inappropriate, Plaintiff Candidates had no malicious intent, and these statements were not intended to be anti-Semitic. Plaintiff Candidates' intent was instead to emphasize that the current leadership may be too close to the employers, especially given the common community relationship between the head of the union and the head of the employer

16

association.  Plaintiff Candidates have since apologized for such campaign language on several occasions both verbally and in writing and have promised not to use such language in the future.

Nonetheless the language used is protected by the LMRDA.  It is well-established that 29 USC § 411(a)(2) protects union members from disciplinary retaliation for statements concerning union matters—even when the statements amount to libel or slander and even when the statement reflect vitriol and calumny.  As the Second Circuit has explained, "[w]e have adopted the view that union meetings, especially those involving election matters or disputes between rival factions within the union, such as those in the instant case, can be fraught with tension and even sparked with 'vitriol and calumny,' . . . and that leeway for the expression of strongly held views in emotional terms, even when they amount to slander, must be afforded union members." *Petramale v. Local 17 of Laborers Int'l Union of N. Am.*, 736 F.2d 13, 17 (2d Cir. 1984) (quoting *Salzhandler*, 316 F.2d 445, 450 n.7 (2d Cir. 1963)).

Plaintiff Candidates are thus likely to prevail on their claim that it was improper and illegal for the Union to seek to expel Plaintiff Candidates for their statements.  Congress's intent was to provide union members similar free speech rights in elections to those provided by the First Amendment.  It is apparent that candidates for public office in the United States cannot be disqualified for their views, even ones that reflect the most despicable of beliefs.  The Anti-Defamation League, for example, has closely tracked candidates running for the United State Congress who express neo-Nazi or other hateful anti-Semitic views.[3]  However evil these

---

[3] *See, e.g.,* ADL, *How Extremist Candidates Fared in the Midterms* (Nov. 7, 2018) (describing candidates running for Congress who expressed neo-Nazi or other hateful anti-Semitic views) available at <<https://www.adl.org/blog/how-extremist-candidates-fared-in-the-midterms>>.

perspectives, they are not a basis to disqualify candidates even for the most important offices in the land. In this context, there is no basis to think the relatively innocuous comments by Plaintiffs would not be protected by free speech guarantees.

Considering the above it is reasonable to predict that Plaintiff Candidates will succeed in showing that their expulsion at the hand of Defendants is a violation of 29 U.S.C. § 411(a)(2).

2. ***The Trumped Up Disciplinary Proceedings Against Plaintiffs Likely Violates the Due Process Guarantee of the LMRDA.***

At 29 U.S.C. § 411(a)(5), the LMRDA's "[s]afeguards against improper disciplinary action" provide that: "No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." These due process protections were intended "to correct widespread abuses of power and corruption by union officials, including the abuse of union disciplinary powers." *Local Union No. 38 v. Pelella*, 350 F.3d 73 at 83 (2d Cir. 2003).

Plaintiffs here were denied a fair trial. They were not served with signed written charges until 48 hours prior to their trial, not served with evidence in support of those charges until 48 hours prior to their trial, and were repeatedly denied time to prepare before and during the trial. The trial committee itself was missing members, under the Union's own bylaws. The accusers did not appear at trial, and Plaintiffs were denied any ability to cross-examine them. In short,

18

the trial itself was a sham put on with only the intention to expel the Plaintiff Candidates challenging Defendant Isaacson's regime and demanding democracy in the union.

Sufficient time to prepare a defense has been found to be anywhere from 2-4 weeks. Under *Wellman v. Int'l Union Of Operating Engineers,* 812 F.2d 1204, 1206 (9th Cir.1987) (twenty-eight days' notice of a disciplinary hearing was sufficient); *Meader v. Dist. Lodge No. 4, Indus. Union of Marine & Shipbuilding Workers of Am.,*786 F.Supp. 95, 105 (D.Me.1992) (fourteen days sufficient when Plaintiffs intentionally avoided receipt of the charging document); *Null v. Carpenters Dist. Council of Houston,*239 F.Supp. 809, 815 (S.D.Tex.1965) (three weeks sufficient time to prepare a defense). In this matter, there was only a 48-hour period to prepare the defense and 8-10 of those hours was spent by the Plaintiff Candidates working a factory job with their trial beginning at 6pm located an hour away from their work location. Clearly, Plaintiffs did not receive a reasonable time to prepare their defense.

At a minimum, the due process rights guaranteed by LMRDA include the right to actually be *heard*: "The full and fair hearing provision protects the procedural rights afforded to accused members under fundamental and traditional concepts of due process." *Yager v. Carey,* 910 F.Supp. 704, 714 (D.D.C.1995) (quotations marks omitted) (quoting *Ritz v. O'Donnell,* 566 F.2d 731, 735 (D.C.Cir.1977)). Fundamental and traditional concepts of due process must include at the very least that the adjudicating tribunal be present to hear the defense at the trial. But in this matter, only three out of the five trial committee members even bothered to attend the trial.

Another fundamental aspect of due process is that the tribunal be *impartial*. But here the

panel was chosen by members of the Union leadership who were the very persons being challenged by Plaintiff Candidates in the upcoming election. It is not due process for the tribunal to be selected by an interested party. The first "appeal" was to the Executive Committee of the Union—again the very people whose leadership of the Union was being challenged by Plaintiffs. When it was time for the second "appeal", to be voted on by the membership after hearing Plaintiff Candidates defense in their own words, Defendants acted outside the confines of the Constitution and Bylaws and orchestrated a mail ballot vote without providing any defense from the Plaintiff Candidates and instead including a one page letter from Defendant Isaacson.

Finally the mere fact that this was the first discipline trial held in the over 30-year long history of the union is strong inference that the trial was held only to remove and render Plaintiff Candidates ineligible for election.

The expulsion from membership procedure in Defendant's Constitution is enforceable, as well, under Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. *Wooddell v. International Brotherhood of Electrical Workers, Local 71,* 502 U.S. 93 (1991). Equitable relief is appropriate under section 301 for violations of the union constitution. *Shea v. McCarthy,* 953 F.2d 29 (2d Cir. 1992). Union members have standing to enforce the terms of their union constitutions under section 301. *Santos v. District Council of New York City and Vicinity of United Broth. of Carpenters and Joiners of America, AFL-CIO,* 547 F.2d 197, 199 n.1 (2d Cir.1977); *Kozera v. International Brotherhood of Electrical Workers, AFL-CIO*, 230 F. Supp.2d 413, 424 (S.D.N.Y. 2002). Plaintiffs will be able to succeed on the merits that Defendants action to circumvent the rights guaranteed in the Constitution and Bylaws is a

violation of the LMRA.

Plaintiffs are thus likely to succeed on their claim that the disciplinary proceedings seeking to expel them violated the due process protections of the LMRDA.

**3_. The Expulsion of Plaintiffs from the Union Likely Violates the Equal Protection Guarantee of the LMRDA._**

The purpose of the LMRDA is to guarantee the "full and active participation by the rank and file in the affairs of the union." *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 182-82, 85 S.Ct. 300, 306, 13 L.Ed.2d 214 (1964). These provisions are intended to ensure a full and fair democratic process inside unions so that members are able to exercise their electoral will. As the Second Circuit has explained, "Congress, by passing a 'Bill of Rights' for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy." *Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir. 1967) cert. den. 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968). Thus upholding the rights of union members to fully participate in an internal democratic electoral process is imperative to the purpose of the LMRDA.

29 U.S.C. § 411(a)(1) provides, among other things, for the equal rights of union members to caste votes of their choosing in elections or referendums: "Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership

meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

This provision guarantees all members equally the rights guaranteed by the union's constitution, bylaws, or rules as they relate to union elections. The Union cannot take steps to undermine the right of each union member to cast a meaningful vote in union matters. *See, e.g., Brown v. Electrical Workers, Local 58,* 936 F.2d 251 (6th Cir. 1991); *Postal Workers Local 6885 v. American Postal Workers Union,* 665 F.2d 1096, 1101-02 (D.C. Cir. 1981) (collecting cases at 1101 n.12); *Christopher v. Safeway Stores, Inc.,* 644 F.2d 467, 470 (5th Cir. 1981) (declining "the Union's invitation to read this statute to mean that a right created or protected by the statute may be abridged with abandon provided there is an even-handed denial to all."); *Trail v. International Brotherhood of Teamsters,* 542 F.2d 961, 966 (6th Cir. 1976) (holding that "the word 'referendum' guarantees to all union members a right to vote on a union contract which any of them enjoy").

The effort by the Union here to expel all the challengers in the election so that incumbent officers can run unopposed risks disenfranchising the union member electorate out of the opportunity to vote for candidates they support. In fact, Congress enacted the LMRDA "to shield the union membership from arbitrary, autocratic, and despotic control by union officers and leaders." *Sheet Metal Workers International Association v. Lynn,* 488 U.S. 347 (1989). This type of despotic control is what takes away the memberships right to vote for candidates of their choosing.

That is exactly what is happening here. The Union has pursued its complaint about

22

Plaintiff's campaign literature in an effort to continue the 18-year despotic control by the existing union officers and leaders.  It was Plaintiff Candidates who finally forced the Defendant, through an LMRDA complaint, to even hold elections in the first place.  Even though this election is supervised by OLMS, the internal union manipulation of the discipline process will result in expelling Plaintiff Candidates from membership.  These are the same Plaintiff Candidates that Plaintiff Members have expressed an interest in supporting, nominating and electing.  The Union will violate the equal protection rights of Plaintiff Members by expelling Plaintiff Candidates from membership.

Plaintiffs  are thus likely to prevail on their claim that the effort to expel all of the challengers to the current leadership violates the equal rights clause of the LMRDA.

### B.  Plaintiffs Are Threatened With Substantial Irreparable Injuries

*1.  <u>By refusing to hold a democratic election, the incumbents have sent a message to the union's membership that exercising their democratic voting right is a futile gesture</u>.*

The Union is acting to expel from membership each of the opposition candidates based on unsubstantiated charges that violate their freedom of speech and without providing them with due process.  The Bill of Rights for Union members was developed to prevent precisely this situation that allows union incumbent leadership to act outside of the bounds of democratic processes.  By losing their membership status, Plaintiff Candidates are threatened with substantial irreparable injury that will not be able to be repaired after election results are received.

The Union's refusal to honor the Constitution and Bylaws of the Union on the eve of the

23

first officer election it will hold in at least 18 years is a powerful and demoralizing message to the membership that they should not waste their time on electing candidates who are not politically favored by the Union.

The tactic, which promotes cynicism, is referred to by rank-and-file members as "vote 'til you get it right." Untold numbers of members may not bother to exercise their voting rights in the upcoming election, having been persuaded by the defendants' unlawful tactics to remove challenger candidates from eligibility for the ballot. The message is that the exercise of voting rights in this Union is a waste of time and a futile gesture. The failure to uphold candidate eligibility in this matter may lead to greatly reduced participation in election campaigns and the election process by members as they see the retribution Plaintiffs have received for running for office and how easily Defendants removed them from membership.

2. *The members are being denied representation by elected officers of their choice.*

Plaintiff Members' will be deprived of their choice to elect Plaintiff Candidates. Members are entitled to be represented by the candidates whom they vote for. Particularly at such a volatile time in the history of this union, the members are entitled, without further delay, to union decision-making by the leaders they elect.

*Cf. Mason Tenders District Council v. Laborers' International Union,* 884 F. Supp. 823, 833 (S.D.N.Y. 1995) ("A fundamental right which LMRDA was enacted to protect is a local union's right of self-determination."); *Smith v. Distillery, Rectifying, Wine & Allied Workers International Union of America,* 1970 WL 638, at *5 (E.D. Ky. 1970) ("The local membership has been disenfranchised and deprived of the local autonomy to which it would ordinarily be

24

entitled. The right of self determination in matters which are purely local in nature is a substantial right which should not be taken away lightly and the deprivation of which cannot be meaningfully recompensed.").

Violation of equal voting rights under section 101(a)(1) is an irreparable injury. *Kupau v. Yamamoto,* 622 F.2d 449, 457 (9th Cir. 1980); *Beckman v. Local No. 46 International Association of Bridge, Structural and Ornamental Iron Workers,* 314 F.2d 848 (7th Cir. 1963) (refusal to implement a vote denied voting rights "as effectively as if they had stuffed the ballot box itself"); *Pignotti v. Local No. 3 Sheet Metal Workers International Association,* 343 F. Supp. 236, 243 (D. Neb., 1972), *aff'd,* 477 F.2d 825 (8th Cir.), *cert. denied,* 414 U.S. 1067 (1973); *Stettner v. International Printing Pressmen,* 278 F. Supp. 675, 681 (E.D. Tenn.1967).

An injury to voting rights under the LMRDA has been likened to constitutional injuries. "The loss of First Amendment freedoms, **for even minimal periods of time,** unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (emphasis added); *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir. 1995). The principle articulated in *Elrod v. Burns* applies with equal force to union members' equal voting rights under LMRDA. Cf. *McCormick v. Zero*, *supra.*

### C. The Balance of Hardships Tips in Favor of the Plaintiffs.

Defendant faces no harm from the Temporary Restraining Order and Injunction sought. The union faces no harm by being preliminarily enjoined to permit Plaintiff Candidates to remain members. Moreover, Plaintiff Candidates have not only repeatedly apologized for any harm but also have not engaged in any additional complained of conduct. The timing of Plaintiff

Candidates' expulsion is timed to exclusively benefit Defendant Isaacson to provide him with an unfair advantage in the supervised officer election.

Plaintiffs are candidates in the first elected officers election at the Union in over 18 years. For the first time, many rank and file members are seeking to be represented by elected officers of their choosing. Defendants are manipulating the Constitution and Bylaws to disenfranchise the membership. The interests of democratic unionism plainly favor granting the requested relief.

Title I reflects Congress' judgment that "the efficiency of a monolithic union," and the added cost of democratic government do not counterbalance the deprivations of democratic union government. *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir. 1967). Congress has already weighed the scales in favor of democracy, with all of its inconveniences, inefficiencies, and added costs. *Wade v. Teamsters, Local 247*, 527 F. Supp. 1169 (E.D. Mich. 1981). Title IV reflects how Congress decided to tip the scales:

**D. The Public Interest Favors the Requested Relief**.

Federal labor policy, as expressed in the LMRDA, strongly favors the preservation of the union members' "bill of rights" and democracy within unions. *Hall v. Cole*, 412 U.S. 1 (1973).

**CONCLUSION**

Plaintiffs respectfully request the Court to enter the preliminary injunction that they have described in these papers.

Respectfully submitted,

Dated: October 20, 2020

New York, New York

Retu R. Singla
Law Office of Retu Singla
11 Broadway
Suite 615
New York, NY 10004
(646) 228-4729
rsingla@workingpeopleslaw.com
Attorneys for Plaintiffs